IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CHARLES AUSTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-204 (GMS) |
| | ) | |
| STANLEY W. TAYLOR JR. et al., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

### I.    **INTRODUCTION**

The plaintiff, Charles Austin ("Austin") is an inmate at the Howard R. Young Correctional

Institution ("HRYCI") in Wilmington, Delaware. On April 9, 2008, Austin filed a complaint against

the current and former Commissioners of the Delaware Department of Corrections (the "DDOC"),

Stanley W. Taylor ("Taylor") and Carl C. Danberg ("Danberg"), respectively; the current and former

Wardens of HRYCI, Raphael Williams ("Williams") and Philip Morgan ("Morgan"), respectively;

the Chief of the Bureau of Management Services of the DDOC, Joyce Talley ("Talley") (collectively,

the "State defendants"); Correctional Medical Services, Inc. ("CMS"); and unnamed "John Doe"

employees of CMS. Austin's claims arise under 42 U.S.C. § 1983 and the Eighth Amendment to

the United States Constitution. Austin alleges that the defendants failed to provide constitutionally

adequate medical care. Austin further alleges medical malpractice under Delaware law.

On March 24, 2009, the court issued a Memorandum Opinion (D.I. 28) and Order (D.I. 29),

dismissing Austin's claims against Williams, because Austin had failed to effect service upon him.

The court's Memorandum Opinion also dismissed Austin's 42 U.S.C. § 1983 claims against CMS,

because the court concluded that his allegations regarding CMS' inadequate medical care failed to state a claim. On April 3, 2009, Austin filed a motion for reconsideration (D.I. 31), requesting to amend his claims against CMS. On July 22, 2009, the court issued an Order (D.I. 36) granting the motion in part and permitting Austin to file an amended complaint against CMS.

Presently before the court are motions for summary judgment filed by the remaining State defendants and CMS. For the reasons discussed, the court will grant the State defendants' motion for summary judgment and grant CMS' motion for summary judgment.

## II.    BACKGROUND

Austin suffers from Diabetes (Type-2) and was an inmate incarcerated at the HRYCI during the relevant time period set forth in the amended complaint. While housed at HRYCI, Austin received treatment for his diabetes. (D.I. 37 ¶ 3.) During this time, the DDOC contracted with CMS to provide medical and health care services to the inmates. (Id. ¶ 6.) On or about July 20, 2006, officials at HRYCI informed Austin that a CMS nurse, who was identified as "Nurse Beth," had not followed standard protocol for testing blood sugar levels and administering insulin injections. (Id. ¶ 14.) More specifically, Austin was informed that, on several occasions between April 10, 2006 and July 9, 2006, Nurse Beth used a single hypodermic needle to draw blood from diabetic inmates to test their blood sugar levels, and then used the same needle to draw insulin from a multiple dose vial and inject them with the insulin. (Id. ¶ 14.)

Once officials at HRYCI learned of the inmates' allegations regarding Nurse Beth's procedure for administering insulin, the DDOC began an internal investigation. (D.I. 54 at A000060.) The DDOC investigation included interviews with Nurse Beth, and two of her co-workers, Nurse Jessica Niba, and Nurse Colleen Bell. (Id. at A000064-65.)   The DDOC

2

investigators also interviewed Jackie Sue Powell, a correctional officer, and several inmates who had made the allegations against Nurse Beth. (Id. at A000065-70.)   On August 18, 2006, the DDOC internal affairs unit issued a memorandum regarding its investigation.   Specifically, the DDOC investigators concluded that "some of the [inmates'] allegations [regarding Nurse Beth's procedure for administering insulin] are true."   (D.I. 130 at A000071.)   The DDOC investigators also concluded, however, that "it has proven virtually impossible to identify the specific dates of occurrence or the specific [] inmates involved."   (Id.)

In addition to conducting the internal investigation, the DDOC and CMS contacted the Delaware Division of Public Health to develop a response plan and notify anyone who may have been at risk of infection based upon the plaintiffs' allegations.   (D.I. 54 at A000074.)   On July 20, 2006, HRYCI officials met with all of the diabetic inmates and provided each with a document entitled Patient Information Sheet (the "PIS").   (See id. at A000040.)   The PIS summarized the allegations against Nurse Beth, stated that HRYCI was investigating the charges, noted the proper procedure for administering insulin, and stated that Nurse Beth had denied the allegations.   (Id.)   A hand written addendum to the PIS stated "[s]ome patients in the group have tested positive for hepatitis C."   (Id.)   Finally, the PIS stated that CMS was offering the inmates blood testing and counseling.   (Id.)   According to the PIS, the blood testing was offered in three steps: (1) an initial blood test at the time of counseling; (2) if the fist test was negative, then a second blood test in three months; and (3) if the second blood test was negative, then a third blood test in six months.   (Id.)

Austin chose to undergo the testing offered by the DDOC and, on July 20, 2006, signed an informed consent agreement, which states "I do . . . consent to have my blood drawn for HIV, Hepatitis B, and Hepatitis C testing."   (Id. at A000039.)   Austin did not test positive for an blood-

3

borne illness.

In addition to testing the inmates, CMS retained Helen Kwakwa, M.D., M.P.H. ("Dr. Kwakwa"), to review the test results and render an expert opinion concerning the extent to which the inmates actually contracted some blood-borne illness as a consequence of the incident. (D.I. 56 at 4.) After reviewing the test results, Dr. Kwakwa concluded, "[c]urrent available laboratory data indicate no transmission of [h]epatitis A, B or C, or HIV as a result of the alleged July 7, 2006 incident. Had transmission occurred, the data obtained at 6 months should have indicated so. Therefore, no further testing is recommended in follow up to this alleged incident." (D.I. 56 Ex. D at CMS00224.)

## III.   THE PARTIES' CONTENTIONS

Austin asserts that the State defendants, as supervisors responsible for the administration of health care to inmates, failed to insure that CMS provided constitutionally adequate medical care. With respect to his claims brought against Taylor and Talley in their individual capacities, Austin alleges that they: (a) adopted and implemented policies and practices which were intended to contain the costs of providing medical services to the inmates, including himself, and which they either knew or should have known would cause CMS to provide personnel who were not qualified or properly trained to provide medical care that met the minimum requirements of the Eighth Amendment; and (b) adopted and implemented policies and practices which encouraged CMS to provide for testing and treatment for his medical conditions that did not meet the minimum requirements of the Eighth Amendment. To support his assertions, Austin offers the findings of the United States Department of Justice (the "DOJ") investigation as evidence that the medical care provided by DDOC was constitutionally inadequate, and was the result of policy and practice that condoned inadequate

4

medical care and oversight.[1] (D.I. 60 at 3-4, 8.)

Austin also asserts that CMS was deliberately indifferent to his serious medical needs thereby violating the Eighth Amendment and 42 U.S.C. § 1983. Specifically, Austin asserts that CMS failed to: (1) hire a competent medical director to oversee the medical care of inmates; (2) maintain adequate staffing levels of nurses and physicians at HRYCI to enable the nurses and physicians to provide adequate care; (3) maintain adequate supervision of nurses and physicians at HRYCI to ensure that the nurses and physicians were providing adequate medical care and were not utilizing unsafe techniques, methods or practices that placed the inmates at risk of exposure to contagious disease; (4) provide adequate training for its nurses and physicians at HRYCI; and (5) provide adequate medical supplies for its nurses and technicians.

Austin further alleges that CMS failed to render and provide medical services in conformity with the applicable standards of care and committed medical negligence within the meaning of Del. Code Ann. tit. 18, § 6801. Austin avers that he has suffered physical and psychological pain including anxiety and depression as a direct and proximate result of CMS' failure. Austin further claims that CMS' medical negligence caused him to fear that he would contract a blood-borne illness, and that his fear is compensable.

---

[1] The Civil Rights Division of the DOJ conducted an investigation of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government to identify and root out systemic abuses. The investigation found substantial civil rights violations at four of the five facilities: Delores J. Baylor Women's Correctional Institution, HRYCI, Delaware Correctional Center, and Sussex Correctional Institution. The investigation resulted in the entry of a memorandum of agreement, on December 29, 2006, between the DOJ and the State of Delaware regarding the four institutions. Paragraph I.F. of the agreement provides that it may not be used as evidence of liability in any other legal proceeding. *See Price v. Kozak*, 569 F. Supp. 2d 398 (D. Del. 2008).

Taylor and Talley assert that there is no record evidence demonstrating that they participated in the medical care provided to Austin.[2] They further assert that the DDOC does not have a policy to delay or deny medical care to inmates based on costs. Summary judgment is appropriate, argue Taylor and Talley, because Austin has failed to identify any custom or policy that created an unreasonable risk of an Eighth Amendment violation. In addition, Taylor and Tally argue that summary judgment is appropriate because a non-medical prison official will generally be justified in believing that an inmate is in capable hands, when that inmate is under the care of a medical professional. (D.I. 53 at 16.)

With respect the care provided, Taylor states:

Throughout my tenure as Commissioner, the Department [of Correction] sought to provide inmates with healthcare that was at or above the standards of the National Commission on Correctional Healthcare ["NCCHC"]. . . . The Department contracted with CMS to provide healthcare services to inmates beginning on July 1, 2005. The contract between CMS and the Department required that CMS maintain NCCHC accreditation.

During my tenure, the Department did not adopt policies or practices which encouraged CMS to provide constitutionally deficient care.

To the extent that there is an allegation that the Department kept CMS under "fixed-cost" contract provisions that led to CMS providing constitutionally deficient care, that allegation is not true. . . . The contract with CMS which began on July 1, 2005 contained a renegotiation clause that specifically provided for increases in funding. The clause specified that because the costs provisions were based on historical data and because CMS would be replacing First Correctional Medical, CMS and the Department would meed after January 1, 2006 to assess the prior six months and make any service or cost adjustments as necessary. Funding for the CMS contract was increased several times after it was determined that staffing and funding increases were necessary for CMS to provide the complement of services specified

---

[2] The court discusses only Taylor's and Talley's arguments, because they are the only State defendants sued in their individual capacities. Thus, if the court finds that they committed no constitutional violation and summary judgment in their favor is appropriate, it then follows that Danberg and Morgan are entitled to summary judgment.

in the services contract . . . .

At not time in 2006, did I participate in any decision regarding the health care of . . . Charles Austin. I have no medical training and do not provide medical care to anyone.

(D.I. 54 at A000076-78.) Moreover, according to Talley:

From July 1996 to February 2009, I served as Chief of the Bureau of Management Services . . . .

The[] . . . Bureau of Management Services . . . provided support to all units within the Department, including: fiscal, payroll, accounts payable, budgeting, purchasing, warehousing, food services, healthcare for the inmates, substance abuse treatment, management information services, facilities maintenance and construction. The Bureau of Management Services was also assigned the administration of the health services contract . . . .

To the extent there is a claim that the Department adopted policies intended to contain the costs of providing medical services to inmates thereby causing CMS to provide constitutionally deficient care, the allegation is not true. As a government agency, reducing costs is always a concern and often factored into Department contracts, but the Department did not implement policies or practices that would cause CMS to provide constitutionally deficient care. . . . The Department and the various venders were . . . always looking for ways of increasing the quality of medical care services within the budget. For example, if a number of inmates needed to see an outside specialist, the specialist would be brought into the facility to see the inmates. As another example, the Department recognized that it could save money by buying a number of dialysis machines and placing them in the institutions for the inmates that needed them rather than arranging for inmates to transport outside the facility for dialysis.

At no time during 2006, did I participate in any decision regarding the health care of . . . Charles Austin. I have no medical training and do not provide medical care to anyone.

(D.I. 54 at A00079-81.)

CMS contends that summary judgment in its favor is appropriate for two reasons. First, CMS contends that the incidents involving Nurse Beth were not the proximate cause of any physical injury to Austin. Second, CMS contends that fear of contracting a blood-borne illness is not compensable

where testing has ruled out that possibility, and in the absence of physical harm suffered by a plaintiff.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). The facts must be viewed in the light most favorable to the nonmoving party and all reasonable inferences from the evidence must be drawn in that party's favor. *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). If the court determines that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

## IV.   DISCUSSION

### A.   The Plaintiff's Claims Against the State Defendants

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103

8

(1976). In order to set forth a cognizable claim, an inmate must prove (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by intentionally denying or delaying access to medical care. *Estelle*, 429 U.S. at 104-05.

[A] prisoner has no right to choose a specific form of medical treatment, so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-40 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under section 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, mere disagreement as to the proper medical treatment is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted). Significantly, when an inmate is under the care of medical experts,

> a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

9

*Id.* at 236; *see also Woloszyn v. County of Lawrence*, 396 F.3d 314, 321 (3d Cir. 2005).

Liability in a section 1983 action cannot be predicated solely on the operation of respondeat superior. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted). A plaintiff may, however, set forth a claim for supervisory liability under section 1983 if he (1) identif[ies] the specific supervisory practice or procedure that the supervisor failed to employ, and show[s] that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). It is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had done more. *Brown*, 269 F.3d at 205. He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury.

Considering the record in the light most favorable to Austin, the court concludes that summary judgment is appropriate for several reasons. First, there is no record evidence demonstrating that Taylor or Talley were involved in or even knew of Austin during the events in dispute. Second, Austin has not presented any evidence to refute Taylor's or Talley's declarations, nor shown anything more than conjecture to establish liability. Third, the record evidence demonstrates that the State defendants took immediate action upon being notified of the inmates' allegations against Nurse Beth. Not only did the State defendants conduct an internal investigation into Nurse Beth's procedure for administering insulin, but they also met with the diabetic inmates

10

on July 20, 2006, handed out the PIS, and tested the inmates for blood-borne illnesses within a few days of the meeting. Finally, while Austin urges the court to consider the DOJ investigation, the court declines to embrace any findings in light of the specific caveat that the agreement between the State of Delaware and the DOJ may not be used as evidence of liability in any other legal proceeding.[3]

### B.    The Plaintiff's Medical Negligence Claims Against CMS

In Delaware, medical negligence is governed by the Delaware Health Care Negligence Insurance and Litigation Act (the "Act"). Del. Code Ann. tit. 18, §§ 6801-6865. Pursuant to Del. Code Ann. tit. 18, § 6801(7), medical negligence is defined as:

> any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.

The Act creates a statutory scheme that imposes rigid requirements on plaintiffs seeking to bring tort claims arising from the provision of medical services. *Conway v. A.I. DuPont Hosp. for Children*, Civil Action No. 04-4862, 2009 WL 57016 at *5 (E.D. Pa. Jan. 6, 2009). Thus, to establish a claim for medical negligence, a plaintiff must present "expert medical testimony . . . as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death. . . ." Del. Code Ann. tit. 18, § 6853(e). In other words, when a party alleges medical negligence, Delaware law requires the party to produce expert

---

[3] Because the court concludes that the State defendants committed no Eighth Amendment violation and will grant the State defendants' summary judgment motion on that ground, it need not consider the State defendants' alternative grounds for summary judgment.

testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury. *Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (quoting *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)); *see* Del. Code Ann. tit. 18, § 6853(e).

As noted above, a plaintiff must produce expert testimony in order to sustain a claim for medical negligence. *See Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991), *cert. denied*, 504 U.S. 912 (1992) ("[T]he production of expert medical testimony is an essential element of a plaintiff's medical [negligence] case."). Here, Austin has failed to produce any expert medical testimony regarding the applicable standard of care, CMS's alleged deviation from that standard, or causation, which is fatal to his claims. Accordingly, the court will grant CMS' motion for summary judgment as to Austin's medical malpractice claims.

## V.    CONCLUSION

For the aforementioned reasons, the court will grant the State defendants' motion for summary judgment, and grant CMS' motion for summary judgment.[4]

Dated: August 20, 2010

CHIEF, UNITED STATES DISTRICT JUDGE

---

[4] The court notes that it is granting CMS' motion for summary judgment only as to Austin's medical malpractice claims. Austin has properly alleged claims against CMS pursuant to 42 U.S.C. § 1983. A footnote in CMS' reply brief to its motion for summary judgment appears to raise, for the first time, its entitlement to summary judgment on Austin's section 1983 claims. CMS, however, provides no analysis of Austin's section 1983 claims. Indeed, the sum total of CMS' argument is as follows: "Although Mr. Austin has asserted a claim under 42 U.S.C. § 1983 as well, he has produced no evidence of a 'custom or policy' through which the incident occurred. Indeed, Mr. Austin's claim is that the incident was a radical, isolated departure from existing policies and procedures." (D.I. 61 at 2 n.1.) The court, therefore, will not address CMS' "argument" on this issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHARLES AUSTIN,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      C.A. No. 08-204 (GMS)
                                         )
STANLEY W. TAYLOR JR. et al.,            )
                                         )
            Defendant.                   )
                                         )

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1.     The State defendants' Motion for Summary Judgment (D.I. 52) is GRANTED.

2.     CMS' Motion for Summary Judgment (D.I. 55) is GRANTED.

Dated: August 20 , 2010

CHIEF, UNITED STATES DISTRICT JUDGE